# In the United States Court of Federal Claims

**RELIABILITY AND PERFORMANCE TECHNOLOGIES, LLC,**

    *Plaintiff,*

v.

**THE UNITED STATES,**

    *Defendant.*

No. 22-13

(Filed: May 23, 2024)

*Howard W. Roth*, Oles Morrison Rinker & Baker, LLP, Seattle, Washington, for Plaintiff.

*Elizabeth M.D. Pullin*, Trial Counsel, *Lisa L. Donahue*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER

**HADJI,** *Judge*.

    Plaintiff Reliability and Performance Technologies, LLC (Reliability) brings this three-count complaint against the Navy, under the Contract Disputes Act, 41 U.S.C. § 7101 *et. seq*, alleging breach of contract (Counts 2 and 3) and breach of the duty of good faith and fair dealing (Count 1) for the Navy's failure to reimburse it under a cost-reimbursement contract for certain indirect costs that the Government's audit confirms it incurred performing highly praised work. *See generally* Compl., ECF 1. Before the Court is the Government's Motion for Summary Judgment on all three counts, in which the Government argues: (1) the Limitation of Funds clause in the contract dictates that Reliability has no entitlement to the disputed costs; (2) Reliability released its right to recover the disputed costs; and (3) the parties' interactions do not indicate that the Navy violated the duty of good faith and fair dealing. Mot. for Summ. J. at 20, 23, 32, ECF 40 (Mot.).

    For the reasons stated below, the Government's Motion is **DENIED** with respect to the breach of contract allegations (Counts 2 and 3) and **GRANTED** with respect to the breach of the duty of good faith and fair dealing allegation (Count 1).

## BACKGROUND

On March 1, 2005, the Naval Sea Systems Command, Naval Surface Warfare Center, Carderock Division (the Navy), awarded Reliability an indefinite delivery / indefinite quantity (IDIQ) contract, No. N00178-05-D-4525 (the IDIQ contract), under the Multiple Award Contract vehicle known as Seaport Enhanced (Seaport-e). Def.'s App. at 1, 8, ECF 40. Pursuant to the IDIQ contract, the Navy issued a delivery order, No. N00178-05-D-4525-EHP1 (delivery order or EHP1), to provide the Navy's Program Executive Office Ships (PEO Ships) with engineering and technical services for "new acquisition and in-service programs." *Id*. at 57, 62. It specified, "[a]s critical and urgent work is identified," Reliability is to provide technical and project management support for this "emergent work" on surface combatant, expeditionary, and amphibious class ship programs. *Id*. at 62. The Court refers to the IDIQ contract and the delivery order collectively as "the contract."

The delivery order was an incrementally funded Cost-Plus-Fixed-Fee (Term / Level of Effort) type of contract.[1] It lasted from May 14, 2010, to May 13, 2015.[2] *See id*. at 57-61, 72, 82, 3319. Over this five-year duration, the Navy issued sixty-seven modifications to the delivery order, almost all of which either increased the incremental funds allotted to the work or the overall contract value. *Id*. at 58, 3319-55. The delivery order originally had an incremental funding ceiling of $201,353.00 and a value of $3,828,434.33. *Id*. at 58. By the end of its performance period, the Navy had increased the total incremental funding ceiling and contract value to $25,493,486.51. *Id*. at 3355. Reliability's claim is for certain indirect costs of $1,094,060.62, which the Government denied on the basis that they exceed the incremental funding ceiling of the contract. *Id*. at 7899-03.

### I.     Pre-Award Audit

In 2005, the Defense Contract Audit Agency (DCAA) conducted a Pre-Award Survey concluding that the design of Reliability's accounting system was considered acceptable for the award of the contract. Pl.'s App. at 3645-52, ECF 46. DCAA stated "the design of [Reliability's] accounting system is, in all material respects, considered

---

[1] The delivery order, as awarded, did not explicitly state the contract type in accordance with the IDIQ contract. However, the Court views the delivery order as a Cost-Plus-Fixed-Fee (Term) type of contract. The IDIQ contract explained the Cost-Plus-Fixed-Fee (Term) contract type as follows: "The term form describes the scope of work in *general terms* and obligates the contractor to devote a *specified level of effort* for a stated time period." *Id*. (emphasis added). Consistent with a Cost-Plus-Fixed-Fee (Term) type of contract, the delivery order provides a general description of the work (Engineering and Technical Services for PEO Ships Acquisition and In-Service Programs), lists estimated costs and estimated fees, but does not specify delivery of an end product—the distinguishing characteristic of a Cost-Plus Fixed Fee (Completion) type of contract. *Id*. at 62, 75. Consistent with a Cost-Plus-Fixed-Fee (Term) contract type, Mod. No. 67 described the contract as "a level of effort, severable type task order." Def.'s App. at 3319. Hence, it is a Cost-Plus-Fixed-Fee (Term) contract, also referred to as a "level of effort" type of contract.

[2] On May 12, 2015, the Navy issued Modification No. 67 to the delivery order, which extended it through September 30, 2015, but this modification did not increase the contract value or allotted funds or permit new work. *See* Def. App. at 3319.

acceptable for award of a prospective contract ….." *Id*. at 3647. However, in February 2007, DCAA prepared an additional audit report. *Id*. at 4745-55. The February 2007 DCAA Report concluded that Reliability's accounting system was deficient, stating that in DCAA's opinion, "the design of the accounting system is not, in all material respects, considered acceptable for award of a prospective contract in accordance with the criteria contained in Federal Acquisition Regulation (FAR) 53.209-1(f)." *Id*. at 4747. In April 2007, DCAA issued a follow-up Report to its February 2007 Report, which concluded: "In our opinion, the design of the accounting system is, in all material respects, considered acceptable for award of a prospective contract in accordance with the criteria contained in FAR 53.209-1(f). The accounting system is in operation." *Id*. at 4756-58.

## II.     Key Contract Provisions

The contract contained several cost provisions that governed the responsibilities of the parties. At the top of the first page of the delivery order (after the cover page), under the heading "General Information," the delivery order stated:

> 1. Incremental Funding in the amount of $201,353.00 is hereby obligated on this Task Order. In accordance with contract clause 52.232-22 "Limitation of Funds", the Government is not obligated to reimburse the contractor for any costs incurred in excess of this amount unless additional funds are made available and obligated under this task order in a subsequent modification.
>
> 2. The total amount of funds obligated is increased by $201,353.00 from $0.00 to $201,353.00. The total contract value remains unchanged at $3,828,434.33.

Def.'s App. at 58. The delivery order further stated:

> [T]he Government will allot additional amounts to this contract from time to time for the incrementally funded CLINs/SLINs [(contract line item numbers/subline item numbers)] by unilateral contract modification, and any such modification shall state separately the amount(s) allotted for cost, the amount(s) allotted for fee, the CLINs/SLINs covered thereby, and the period of performance which the amount(s) are expected to cover.

*Id*. at 75. The contract incorporated by reference the Limitation of Funds clause (FAR 52.232-22) (April 1984) and the FAR Allowable Cost and Payment clause (FAR 52.216-7) (December 2002). *Id*. at 43-44.

The Limitation of Funds clause requires the contractor to provide the Contracting Officer written notice when total costs will exceed 75 percent of the total amount allotted

to the contract by the Government. FAR 52.232-22(c).[3] Additionally, the Limitation of Funds clause requires the contractor to provide the Government with an estimated amount of additional funds required to continue performance for the remainder of the period of performance of the contract. *Id.*

The Allowable Cost and Payment clause requires the Government to pay the contractor for all allowable costs in accordance with FAR subpart 31.2 and the terms of the contract. FAR 52.216-7(a). It also describes how final indirect cost rates are established (in accordance with FAR subpart 42.7) and how the contractor is permitted to bill indirect costs until final indirect rates are established. FAR 52.216-7(d), (e). Under this clause, the contractor is required to submit a final indirect cost rate proposal to the Government following the expiration of each fiscal year of the contract, and the parties are to collectively negotiate the final indirect cost rates "as promptly as practical after receipt of the Contractor's proposal." FAR 52.216-7(d)(2)(ii). Further, "[w]ithin 120 days … after settlement of the final annual indirect cost rates for all years … the Contractor shall submit a completion invoice or voucher to reflect the settled amounts and rates." FAR 52.216-7(d)(5). Lastly, the following provision governs what the parties are required to do until final indirect rates are established:

> Until final annual indirect cost rates are established for any period, the Government shall reimburse the Contractor at billing rates established by the Contracting Officer or by an authorized representative … subject to adjustment when the final rates are established. These billing rates—
>
> (1) Shall be the anticipated final rates; and
>
> (2) May be prospectively or retroactively revised by mutual agreement, at either party's request, to prevent substantial overpayment or underpayment.

FAR 52.216-7(e).

### III. Performance and Rate Negotiation

It is undisputed that Reliability's performance on the contract was exceptional in nearly all respects. *See* Compl. ¶ 53; Answer ¶ 53, ECF 19; Pl.'s App. at 4711-13. Specifically, on the final performance ratings for the contract, the Navy rated Reliability

---

[3] The contract also references the Limitation of Cost clause (FAR 52.232-20) (April 1984). Def. App. at 44, 75. While the Limitation of Cost and the Limitation of Funds clauses are substantively almost identical, the Limitation of Funds clause is for incrementally funded contracts, *see* FAR 32.706-2(b), and therefore references the "allotted" amount, *i.e.,* the incremental funding ceiling. The Limitation of Cost clause is for fully funded contracts, *see* FAR 32.706-2(a), and therefore references the "total" contract cost, which is the overall contract ceiling. As this delivery order was incrementally funded from its inception, the Limitation of Funds clause is most appropriate. As such, and because the parties focus on the Limitation of Funds clause, the Court focuses on the Limitation of Funds clause.

as "Exceptional" for "Quality," "Exceptional" for "Schedule," "Exceptional" for "Cost Control," and "Very Good" for "Management." Pl.'s App. at 4712. The Navy noted that Reliability's "personnel offered significant experience and expertise in the design, production, and testing phases of new ship acquisition, and in-service programs," and that it "completed tasks on time and within budget." *Id.*

In accordance with Section 3.1 of the EHP1 Statement of Work, Reliability provided the Navy monthly reports to the Task Order Manager and Technical Point of Contact. Def.'s App. at 64, 6972. These reports outlined the financial status of the delivery order, including the total funded value, funds expended in the specified period, total percentage of contract value expended, unfunded balance remaining, and percentage of funded value expended. *Id*. at 7833-35. These reports were not sent to the contracting officer and did not include an estimate of the amount of funding necessary to continue performance until the end of the period of performance. Mot. at 7; Pl.'s Resp. at 18-22.

### A. FY2007-FY2011 Rate Negotiations

On June 28, 2010, Reliability executed a certificate of final indirect costs for FY2007. Def.'s App. at 7314. Reliability submitted its FY2008-2009 indirect cost proposals on January 14, 2011, and its FY2010-FY2011 indirect cost proposals on August 9, 2011. *Id*. at 7319, 7340. On July 30, 2015, DCAA issued a report claiming it was unable to audit the FY2008-FY2009 proposals due to defects in Reliability's cost accounting system. *Id*. at 7319-20. Similarly, on November 16, 2015, DCAA claimed it could not audit the FY2010-FY2011 proposals. *Id*. at 7340.

On December 7, 2015, Reliability and the Government executed indirect rate agreements for FY2007-FY2011 of approximately $1 million, a reduction from Reliability's $1.29 million request in its indirect cost proposals. Mot. at 13-14; Pl.'s Resp. at 25; Pl.'s App. at 3876-81; Def.'s App. at 7457-71. The agreements included the following language:

> This Agreement does not constitute an obligation of funds. Recovery of costs pursuant to this Agreement shall be subject to the Limitation of Cost, Limitation of Funds and Limitation of Government Liability clauses contained in the individual contracts to which this Agreement applies.

Def.'s App. at 7457, 7460, 7463, 7466, 7469; Pl.'s App. at 4610, 4614, 4618, 4622, 4626.

### B. FY2012-FY2015 Rate Negotiations

Reliability provides evidence that it submitted to DCAA the FY2012 indirect cost proposal (on June 30, 2013) and the FY2013 indirect cost proposal (prior to June 30, 2014). *See* Pl.'s App. at 3480-3597; Pl.'s App. at 4820-4994; *see also* Pl.'s App. at 3971. It submitted three revisions to the FY2012 and FY2013 indirect cost proposals, which were accepted by DCAA in 2020. Pl.'s App. at 3975-76, 4820-5026.

5

On July 28, 2016, Reliability submitted its final indirect cost proposals for FY2012-FY2013. Def.'s App. at 7479-81. On June 15, 2017, DCAA completed an audit for these submissions and issued a disclaimer of opinion finding Reliability's accounting books and records for FY2012-FY2013 inadequate. Def.'s App. at 7472-77. On October 24, 2018, Reliability contacted Contracting Officer John A. Griffiths requesting assistance in settling outstanding indirect variances for FY2008-FY2011 and conducting FY2012-FY2013 incurred cost audits. Pl.'s App. at 4784.

In November of 2013, Reliability contacted Contracting Officer Gary Byram to inquire whether Reliability would be permitted to submit a rate adjustment at the end of performance of the delivery order. Pl. App. at 4709. In an email to Contracting Officer Byram, Reliability wrote: "it is my interpretation that under Seaport you can have a rate adjustment audit performed at the end of a Delivery Order, but someone else is telling me that it's at the end of a contract. What's your interpretation and/or experience?" Pl. App. at 4709. Contracting Officer Byram responded: "I'm familiar with the audit being performed at the end of the performance of the deliver[y] order and then any adjustments would be made." Pl.'s App. at 4709. Reliability also emailed Contracting Specialist Stephen Noethen asking whether contractors were "allowed to submit a rate adjustment invoice at the end of the Delivery order" to which he forwarded the following response from Contracting Officer John Stefano: "yes[,] [t]his does happen on occasion when a contractor's rates change." Pl.'s App. at 4707-18.

On January 31, 2018, Reliability submitted its final indirect cost proposals for FY2014 and FY2015. Def.'s App. 7746. These proposals relied on an updated accounting system Reliability updated in 2015. *Id*. at 7200. In September of 2018, Reliability and the Government executed final indirect rate agreements under which the Government adopted Reliability's proposed rates; the indirect rate agreements included the following clause: "[t]his indirect rate understanding shall not change any monetary ceiling, contract obligation, or specific cost allowance or disallowance provided for [in the contract]." Def.'s App. at 7761.

On September 9, 2019, Reliability filed a request for an equitable adjustment (REA) in an effort to receive reimbursement for indirect costs for FY2012-FY2013, but the Navy denied it and now cites Reliability's failure to provide notice of potential cost overruns and failure to properly monitor indirect costs as justification. *Id*. at 7484; John Capriotti Decl. at ¶ 12; ECF 46-1; Mot. at 15. In January of 2020, Reliability and the Government executed final indirect rate agreements for FY2012-2013. Def.'s App. at 7904-07, 7908-11. The parties agreed to a similar detriment as the FY2007-FY2011 agreements. *See id*. The indirect rate agreements also included the following language:

> 5. This Agreement does not change any costs or rate ceiling, or any specific allowance or disallowance, established by the terms and conditions of any contract to which this Agreement applies.

6

> …
>
> 6. … In all other respects, [Reliability] releases the Government from any and all further liability or claims described in their September 9 2019 letter.
>
> …
>
> 9. … Along with each final voucher, [Reliability] will provide to the [Contracting Officer], any applicable release of claims that will be expressly subject to and conditioned upon payment by the United States Government of said invoice or voucher[.]

*Id.* at 7908-09, 7904-05.

### IV. Reliability's Certified Claim

In March of 2021, Reliability filed a certified claim seeking its indirect costs for FY2012-FY2015. Pl.'s App. at 3338-86; Def.'s App. at 7783-31. Reliability sought indirect costs in the amount of $1,094,060.62. Pl.'s App. at 3338; Def.'s App. at 7783. The contracting officer denied Reliability's certified claim, again citing the lack of notice Reliability provided regarding cost "overruns" and finding that the Navy "was not willing to continue performance at any cost." Def.'s App. at 7901; Pl.'s App. at 3456. The Government did not, and does not, contend that the indirect costs are otherwise unallowable under FAR part 31. Def.'s Reply at 9, ECF 54.

After the Navy denied its claim, Reliability filed its three-count complaint in this matter seeking $1,094,060.62 in indirect costs. Compl. ¶¶ 154, 165, 170. Count I is breach of the duty of good faith and fair dealing. Compl. ¶ 154. Count II is breach of contract for refusing to apply applicable exceptions to the Limitation of Funds clause of the contract and Count III is breach of contract for failing to comply with FAR 42.705-1, as required by the Allowable Cost and Payment clause. *Id*. ¶¶ 156, 163, 167, 170. The Government filed a motion to dismiss Counts I and III for lack of subject matter jurisdiction, or alternatively, to dismiss Count III for failure to state a claim upon which relief may be granted, on May 27, 2022. ECF 12. The Court denied the motion. ECF 20. The Government filed the instant Motion for Summary Judgment on all three counts of the Complaint on December 1, 2023. ECF 40.

## LEGAL STANDARD

The Rules of the United States Court of Federal Claims permit summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). A fact is material if it "might affect the outcome of the suit" and a dispute as to a material fact is genuine if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are

not outcome-determinative will not preclude entry of summary judgment. *Anderson,* 477 U.S. at 247-48. When ruling on a motion for summary judgment, the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 242-43.

On a motion for summary judgment, "all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994). However, the nonmoving party must plead specific facts showing the existence of a genuine factual dispute and conclusory statements or bare assertions are not sufficient to overcome a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex*, 477 U.S. at 317.

## DISCUSSION

In its Motion for Summary Judgment, the Government argues: (1) the Limitation of Funds clause bars Reliability from recovery of the disputed indirect costs; (2) Reliability released its right to recover the disputed indirect costs; and (3) the Navy did not violate the duty of good faith and fair dealing.[4] Mot. at 20-35.

### I.  The Limitation of Funds Clause is Not an Absolute Bar to Recovery

The Government's primary argument for summary judgment is that the Limitation of Funds clause bars Plaintiff's recovery. Mot. at 23-32. More specifically, relying on *Advanced Materials v. Perry*, 108 F.3d 307 (Fed. Cir. 1997), the Government argues Reliability exceeded the "ceiling on the government's contractual liability," "failed to account for its indirect costs," and failed to provide the "government with an estimate of the amount of funding necessary to continue performance until the end of the period of performance." Mot. at 24-26. Accordingly, the Government argues it is excused from any obligation it had to timely negotiate and pay Reliability for its indirect costs in accordance with the Allowable Cost and Payment clause. *Id.* The Court finds this argument unavailing.

As an initial matter, this case and *Advanced Materials* are easily distinguishable based on the type of contract involved. *Advanced Materials* involved a contract for specified work, *i.e.*, the design and development of decontamination kits for the Army. 108 F.3d at 308. Here, the contract was not for specified work but for unidentified "emergent work." Def.'s App. at 62 ("[a]s critical and urgent work is identified," Reliability is to provide technical and project management support for this "emergent work."). Although it is true that "the thrust of the cost limitation [clause] is prospective" as the Government argues, the purpose of a clause that requires dialogue about prospective costs is to allow

---

[4] The Court notes that while it only discusses Defendant's main arguments in support of summary judgment, it has considered all of them.

the parties to "determine their future course of dealing before the estimated cost has been exceeded and, if performance is to continue, to set the amount of the additional cost." Mot. at 31 (citing *Advanced Materials*, 108 F.3d at 310-11). In *Advanced Materials*, the contractor's failure to include prospective estimates about costs was detrimental to the "future course of dealing" dialogue because the contractor had all relevant information and control over the cost and schedule of completing the specified work since the contract specified all of the work that needed to be done upfront. 108 F.3d at 310-11. Thus, *Advanced Materials* describes a classic "overrun." *Id.* In contrast, here, the Government was the party that "identified" what "emergent work" it wanted done and elected to expand the scope of the contract when it desired. Def.'s App. at 62. In fact, over the contract's five-year duration, the Navy issued sixty-seven modifications, nearly all of which either increased the incremental funds allotted to the contract or the overall contract value. *Id.* at 58, 3319-55. It went from an initial value of $3,828,434.33 to a final value of $25,493,486.51, an approximately 550% increase. Pl.'s App. at 58; Def.'s App. at 3355. As such, it is hard to see how Reliability's failure to include notice of prospective costs in its monthly cost reports prevented the Navy from a "future course of dealing" dialogue. To the contrary, the record indicates that Reliability and the Navy had a healthy "future course of dealing" dialogue, which involved Reliability informing the Navy of its incurred costs to date in its monthly reports and the Navy expanding the scope of the contract to make sure "critical and urgent work" was completed. Def.'s App. at 62.

This case is also distinguishable from *Advanced Materials* based on the Navy's alleged noncompliance with its obligations under the Allowable Cost and Payment clause. Specifically, viewing the evidence in the light most favorable to the nonmoving party as required at this juncture, the record indicates a factfinder could reasonably conclude the Government failed to comply with the Allowable Cost and Payment clause by: (1) not promptly negotiating final indirect rates; and (2) by not adjusting the billing rates sufficiently to avoid the variance between the incurred costs and the final indirect rates resulting in a substantial underpayment to Reliability. *See Dairyland*, 16 F.3d at 1202; FAR 52.216-7(d), (e). These two failures to comply with the Allowable Cost and Payment clause, as described in more detail below, distinguish this case from *Advanced Materials* and are valid bases for breach of contract as this Court has already determined in this case. ECF 17 at 10-11 (finding the Allowable Cost and Payment Clause is a valid basis for breach of contract); *see also General Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 545-48 (2000) (finding that the Government breached the contract by refusing "make payments to the Contractor … in amounts determined to be allowable by the Contracting Officer in accordance with subpart 31.2 of the [FAR]"); *Scherr & McDermott, Inc. v. United States*, 360 F.2d 966, 969 (Ct. Cl. 1966) (holding that the contractor was relieved of the requirement of obtaining prior approval for an increase in the contract's cost limitation where the contractor's inability to determine actual overhead was traceable to the Government's failure to audit.).

First, with respect to the allegation that the Navy failed to promptly negotiate final indirect rates, the Allowable Cost and Payment clause required Reliability to submit a final

indirect cost rate proposal each year and for the Government to promptly negotiate the final indirect rates. *See* FAR 52.216-7(d)(2)(ii) (the parties are to collectively negotiate the final indirect cost rates "as promptly as practical after receipt of the Contractor's proposal"). The record includes evidence that Reliability met its obligation to timely submit indirect cost proposals but that the Government cannot show it "promptly" negotiated the final indirect rates. For example, there is evidence that Reliability submitted its FY2012 indirect cost proposal on June 30, 2013, and an updated version before July 28, 2016. *See* Def.'s App. at 7479-81; Pl.'s App. at 3480-3597, 4820-4994; *see also* Pl.'s App. at 3971. Yet, the Government did not agree to the final indirect rates until January 2020, over six years after the initial proposal was submitted and over three years after the updated proposal was submitted. Def.'s App. at 7904-07, 7908-11.

The Government maintains these delays are attributable to failures in Reliability's cost accounting system. Def.'s Reply at 15 ("Even if these dates appear late, so too were Reliability's adequate final indirect cost proposals"); *see* Def.'s App. at 7472-77 (DCAA issued a disclaimer of opinion finding Reliability's accounting books and records for FY2012-FY2013 inadequate). However, the adequacy of Reliability's audit system is factually disputable. For example, in 2005, DCAA's Pre-Award Survey concluded that the design of its audit system was acceptable for the award of the contract. Pl.'s App. at 3645-52. Yet, after award of the IDIQ contract, in February 2007, DCAA issued a contradictory opinion concluding that "the design of the accounting system is not, in all material respects, considered acceptable for award." *Id*. at 4747. Then, coming full circle, in April 2007, DCAA issued a follow-up Report to its February 2007 Report concluding "the design of the accounting system is, in all material respects, considered acceptable for award of a prospective contract in accordance with the criteria contained in FAR 53.209-1(f)." Pl.'s App. at 4757-58. In short, a factfinder could reasonably conclude that the Government failed to promptly negotiate the final indirect rates as required under the Allowable Cost and Payment clause and that it did not have a valid basis to delay its negotiation of the final indirect rates.

Second, with respect to the allegation that the Navy failed to adjust the billing rates sufficiently, the Allowable Cost and Payment clause required the Government to pay Reliability for its indirect costs at billing rates established by the Contracting Officer in a way that aligns as closely as possible to the final indirect rates. FAR 52.216-7 (e) ("Until final annual indirect cost rates are established … the Government shall reimburse the Contractor *at billing rates established by the Contracting Officer* … subject to adjustment when the final rates are established. … These billing rates … *[s]hall be the anticipated final rates*… and … [m]ay be prospectively or retroactively revised … to prevent substantial overpayment or underpayment."). Here, the record indicates a variance between the billing rates and the final indirect rates totaling $1,094,060.62, an amount the Government does not dispute is otherwise allowable but for the alleged lack of notice under the Limitation of Funds clause. *See* Def.'s Reply at 9. In short, a factfinder could reasonably conclude that this variance, which is still unpaid, violates the Government's obligation under the Allowable Cost and Payment clause to pay Reliability for its indirect costs at

billing rates that are not a "substantial … underpayment" of the "anticipated final rates." *See* FAR 52.216-7.

Based on the above, the Court does not find *Advanced Materials* controlling or that the Limitation of Funds clause bars recovery of the disputed costs as a matter of law. As such, the Government is not entitled to summary judgment on Plaintiff's breach of contract claims. *See* Rule 56(a).

## II. Reliability May Reasonably Demonstrate It Did Not Release Its Claims

The Government argues that Reliability released its right to recover the disputed indirect costs.[5] The clearest indication of a release is the following language from the FY2012 and FY2013 indirect rate agreements: "In all other respects, [Reliability] releases the Government from any and all further liability or claims described in their September 9 2019 letter." Def.'s App at 7909. The Government argues that the plain meaning of these words serves to release the Government from "any and all further liability or claims" raised in the September 9, 2019 letter, which is Reliability's request for equitable adjustment for indirect costs for FY2012-FY2013. Mot. at 21. Resisting this reasoning, Plaintiff argues that this language is only a release of a portion of the claims described in the letter. Pl.'s Resp. at 55-57.

At a minimum, Plaintiff's interpretation is plausible. The purpose of the agreement was to establish final indirect rates. Why would the parties execute an agreement containing a provision that essentially waived enforcement of the entire agreement? *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (noting that a court should begin with the plain language of an agreement and an interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous). Further, another portion of the FY2012 and FY2013 indirect rate agreements noted: "[a]long with each final voucher, [Reliability] will provide to the [Contracting Officer], any applicable release of claims that will be expressly subject to and conditioned upon payment by the United States Government of said invoice or voucher." Def.'s App. at 7904-05, 7908-09. It appears that this language contemplated *future* vouchers and *future* releases. If the language that the Government cites was a complete release, it is hard to understand why the agreement also includes language addressing future vouchers and payments. As the Plaintiff pointed out in its Response, the problem with the Government's interpretation is that it does not

---

[5] The Government uses the term "release" quite liberally, citing several provisions that do not contain typical release language. *See* Mot. at 20-22. Rather, these provisions simply "evince" the Government's "intention to not reimburse costs exceeding the funding ceiling." Mot. at 21 (citing FY2012 & FY2013 indirect rate agreements). In this regard, these provisions do not convey any intention that was not already clear from the Limitations of Funds clause. And for the same reasons that the Limitations of Funds clause is not an absolute bar to recovery, neither are these provisions.

adequately explain how the release relates to the very agreement in which it is contained. Pl.'s Resp. at 55-57.

In its Reply, the Government did not attempt to argue that Plaintiff's interpretation is unreasonable. Accordingly, the Court finds that both the Government and Plaintiff have offered plausible interpretations of the release language and it is therefore ambiguous. *See E.L. Hamm & Assoc., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004). ("An ambiguity exists when a contract is susceptible to more than one reasonable interpretation."). When a contract provision is ambiguous, extrinsic evidence may be used to resolve the ambiguity by deriving a construction that effectuates the parties' intent at the time they executed the contract. *See Dureiko v. United States,* 209 F.3d 1345, 1356 (Fed. Cir. 2000). When a contract is "ambiguous, necessitating a review of extrinsic evidence to determine the parties' intent," summary judgment is not appropriate "if material facts are genuinely in dispute." *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 743 (2005). Here, the evidentiary record before the Court, as briefed by the parties, does not address in sufficient detail what is meant by the language the Government argues is a release and therefore is not amenable to summary judgment resolution. Accordingly, the Court cannot conclude as a matter of law that the FY2012 and FY2013 indirect rate agreements operate as a release. As such, the Government is not entitled to summary judgment on Plaintiff's breach of contract claims based on its release arguments. *See* Rule 56(a).

### III. The Navy Did Not Breach the Implied Duty of Good Faith and Fair Dealing

Finally, the Government argues that it did not breach the implied duty of good faith and fair dealing as Reliability alleges. Every contract includes an implied duty of good faith and fair dealing, which obligates contracting parties "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981); *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014). "The implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf Constr. Co.* at 991. Therefore, with respect to a government contract, "liability only attaches if the government action 'specifically targeted' a benefit" of the contract at issue, destroying a reasonable expectation of the other contracting party. *Westlands Water Dist. v. United States*, 109 Fed. Cl. 177, 205 (2013).

Reliability alleges that the Government breached the implied duty of good faith and fair dealing in two ways. First, Reliability argues that the Government failed to conduct audits in violation of the terms of the contract. Pl.'s Resp. at 91-93. The Court finds this is not a separate cause of action from Count III of the Complaint, because its focus, like Count

12

III, discussed above, is an allegation that the Government breached its obligation under the Allowable Cost and Payment clause of the contract. In fact, the damages Reliability seeks for this allegation are for the exact same thing, indirect costs, and the exact same amount. Because the Court finds these allegations are legally indistinguishable from the breach of contract allegation in Count III, there is no need to consider them again as a separate cause of action for a breach of the duty of good faith and fair dealing. *Dotcom Assocs. I, LLC v. United States*, 112 Fed. Cl. 594, 600 (2013) ("Every breach of contract suit in this court involves a plaintiff who alleges that a defendant owes the plaintiff money. If withholding … money by itself was enough to establish a breach of the implied covenant of good faith and fair dealing, every breach of contract would also be a breach of the implied covenant.").

Second, Reliability asserts that the Government violated its duty of good faith and fair dealing when the contracting officer directed Reliability to submit its indirect rate proposals after the EHP1 period of performance but later denied Reliability payment because notice of its rate adjustments was not submitted prior to performance. Compl. ¶ 153; Pl.'s Br. at 93. Relatedly, Reliability also argues that it detrimentally relied on guidance from two contracting officers who stated that Reliability would be allowed to submit a rate adjustment for audit at the end of the period of performance. Compl. ¶ 153.

In November of 2013, Reliability contacted Contracting Officer Gary Byram to inquire whether Reliability would be permitted to submit a rate adjustment at the end of performance of the EHP1 delivery order. Pl. App. at 4709. Contracting Officer Byram responded that he was familiar with post-performance submissions being adjusted. *Id*. Reliability also contacted Contract Specialist Stephen Noethen with the same question, to which he forwarded a response from Contracting Officer John Stefano indicating that was permitted on occasion if the contractor's rate changes. *Id*. at 4707-08. Reliability asserts that this was a violation of the duty of good faith and fair dealing when the contracting officers thereafter denied a rate adjustment on the basis of the request being untimely. Compl. ¶¶ 153-54. The Government challenges Reliability's characterization of these arguments as a "direction," and instead describes them as the contracting officer answering "questions about whether Reliability would be permitted to submit its indirect rate proposals after EHP1 ended, which it did in September 2015." Def.'s Reply at 16. The Court finds the above-referenced exchange was no more than the contracting officers communicating how the process generally unfolds. The exchange does not indicate that Reliability was directed to submit rates at a certain time or act in an inappropriate manner.

In sum, even viewing the facts in a light most favorable to Reliability, the undisputed record indicates that the Government did not act in a manner inconsistent with the contract's express purpose. *See Metcalf Constr. Co. v. United States,* 742 F.3d 984, 991 (Fed Cir. 2014). As there is no genuine issue of fact regarding Plaintiff's claim for breach of good faith and fair dealing, summary judgment on this claim is proper. *See* Rule 56(a); *Anderson,* 477 U.S. at 242-43.

## CONCLUSION

For the foregoing reasons, the Court finds no genuine issue of material fact with respect to Plaintiff's breach of the duty of good faith and fair dealing claim. However, genuine issues of material fact preclude granting summary judgment on Plaintiff's breach of contract claims. Accordingly, the Government's Motion for Summary Judgment is **GRANTED** with respect to Count 1 and **DENIED** with respect to Counts 2 and 3. The parties shall **SUBMIT** a joint status report on or before **June 13, 2024**, including a proposal for further proceedings.

    **IT IS SO ORDERED.**

*[signature]*

PHILIP S. HADJI
Judge